IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CINSAY, INC.                              §
                                          §
        Plaintiff                         §
                                          §
v.                                        §    Civil Action No. 3:13-CV-03628-K
                                          §
JOYUS, INC.                               §
                                          §
        Defendant.                        §

## *MARKMAN* MEMORANDUM OPINION AND ORDER

Before the Court are the parties' briefs on the issue of claim construction of the

patents-in-suit, U.S. Patent Number 8,312,486 ("the '486 Patent"), U.S. Patent

Number, U.S. Patent Number 8,533,753 ("the '753 Patent"), and U.S. Patent Number

8,549,555 ("the '555 Patent). The Court has reviewed the parties' briefs and all related

filings and evidence, including the patents-in-suit, the specifications, the patent

prosecution histories to the extent it was submitted by the parties, as well as the parties'

proposed claim constructions.  The Court hereby construes the disputed claims

according to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en

banc), *aff'd*, 517 U.S. 360 (1996).

## I.    Background

### A.    Procedural

Plaintiff, Cinsay, Inc. ("Cinsay") initiated the current action by filing *Original*

*Complaint for Patent Infringement.* In the Plaintiff's complaint, it is alleged that Defendants, Joyus, Inc. ("Joyus") and Brightcove, Inc. ("GTL") infringed upon certain patents owned by or assigned to Cinsay. Brightcove, Inc. has settled this dispute with Cinsay, but the suit between Cinsay and Joyus remains. Since, the parties dispute the meaning of the claim language of the patents in suit, it is necessary for the Court to construe the disputed claim terms of these patents.

**B.      The Patents in Suit: The '486 Patent, The '753 Patent, and The '555 Patent**

The '486 patent, entitled "Interactive Product Placement System and Method Therefore," was issued by the USPTO on November 13, 2012. It was assigned to Cinsay, who is the sole owner of the entire right, title, and interest in the '486 patent.

The '753 patent, entitled "Interactive Product Placement System and Method Therefore," was issued by the USPTO on September 10, 2013. It was assigned to Cinsay who is the sole owner of the entire right, title and interest in the '753 patent.

The '555 patent, entitled "Interactive Product Placement System and Method Therefore," was issued by the USPTO on October 1, 2013. It was assigned to Cinsay who is the sole owner of the entire right, title and interest in the '555 patent.

The '486 patent, '753 patent, and '555 patent are closely related patents. All patents share the same title and the '753 and '555 patents issue from continuations of the application that resulted in the issue of the '486 patent. The patents disclose

inventions related to the interactive placement of advertisements in video broadcasts. Generally, the patents disclose methods and systems for placing advertisements in a video production without the interruption of the video production. They do this by incorporating an advertisement into the video production in a way that does not substantially interfere with the playback of the video production. For example, an advertisement can be overlaid into the video production while the video continues to play. The inventions further disclose that the advertisements can be correlated and coordinated with the content of the production so that the advertisements will display at opportune moments in the production. The disclosed inventions also allow for interaction between the user with the advertisements. For example, a user who views an advertisement may click on the advertisement or a related icon if the viewer wishes to obtain more information about the product or service being advertised.

The patentee claims that the value of advertisements existing at the time of the invention had been reduced by developments in technology. For example, a user can record a video broadcast using a digital video recorder, and when the user views the playback of the video broadcast that user can fast forward and skip advertisements that interrupt the video playback. The patentee claims that the invention also addresses the problem of viewer annoyance that is caused when a video broadcast is interrupted by an advertisement.

## II.    Applicable Law

A.      **Principles of Claim Construction**

Claim construction is a matter of law. *See Markman*, 52 F.3d at 979. The Federal

Circuit Court has held that "the claims of a patent define the invention to which the

patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005). The Supreme Court has stated that the claims are "of primary

importance, in the effort to ascertain precisely what it is that is patented." *Phillips*, 415

F.3d at 1312. A court looks to three primary sources when determining the meaning of

claims: (1) the claims, (2) the specification, and (3) the prosecution history. *Markman*,

52 F.3d at 979. The claims of the patent must be read in view of the specification of

which they are a part.   *Id.* The specification consists of a written description of the

invention which allows a person of ordinary skill in the art to make and use the

invention. *Id.* This description may act as a dictionary explaining the invention and

defining terms used in the claims. *Id.*   Although a court should generally give such

terms their ordinary meaning, a patentee may choose to be his own lexicographer and

use terms in a manner other than their ordinary meaning, so long as the special

definition of the term is clearly stated in the patent specification or file history. *See*

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court starts with the claim itself, read in light of the specification. *See Vivid*

*Technologies, Inc. v. American Sci.* & *Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999).

While the claims themselves provide significant guidance as to the meaning of a claim

term, the specification is generally dispositive as "it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1314-1315. In addition to the claim language and specification, the prosecution history is often helpful in understanding the intended meaning, as well as the scope of technical terms in the claims. *See Vivid*, 200 F.3d at 804. In particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning. Using these tools, the court construes only the claims that are in controversy and only to the extent necessary to resolve the dispute. *Vivid*, 200 F.3d at 803.

The words of a claim are usually given their ordinary and customary meaning. *See Phillips*, 415 F.3d at 1312. Ordinary and customary meaning is the meaning the claim term would have to a person of ordinary skill in the art (e.g., field of the invention). *See Id.* at 1313; *Markman*, 52 F.3d at 979. A person of ordinary skill in the art would read the claim term in the context of the entire patent, including the specification, not just the particular claim where the term appears. *Phillips*, 415 F.3d at 1313. There are instances where the ordinary meaning of claim language, as a person of skill in the art would understand it, "may be readily apparent even to lay judges," thereby requiring "little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. In these situations, general purpose dictionaries are useful. *Id.*

But, in many cases, the court must determine the ordinary and customary meaning of the claim terms which have a certain meaning in a field of art. *Id.* The court can look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* These sources can include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of the technical terms, and the state of the art." *Id.*

Aside from the written description and the prosecution history, the claims themselves also offer assistance as to the meaning of certain claim terms. *Id.*

When the intrinsic evidence, that is the patent specification and prosecution history, unambiguously describes the scope of a patented invention, reliance on extrinsic evidence, which is everything outside the specification and prosecution history, is improper. *See Vitronics*, 90 F.3d at 1583. While the Court may consult extrinsic evidence to educate itself about the invention and relevant technology, it may not rely upon extrinsic evidence to reach a claim construction that is clearly at odds with a construction mandated by the intrinsic evidence. *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

III.    **Construction of the Patent Claims and Terms**

    A.    **The Disputed Claim Phrases**

The parties dispute the meaning of certain phrases used in the claim language of

the patents in suit. The parties disagree to as to the meaning of the following phrases:

- "cue point," which occurs in Claims 9, 18, and 27 of the '555 patent;

- "calling cue point," which occurs in Claims 1, 4, 5, 8, 9, 12, 13, and 16 of the '486 patent;

- "transmitting an [advertisement/interactive advertising feature," "transmit an [advertisement/interactive advertising feature]," "receive … an interactive advertising feature." At least one of these phrases occurs in Claims 1, 5, 9, and 13 of the '486 patent and Claims 1, 6, and 11 of the '753 patent.

- "transmitting … a video production," "transmit a video production," and "receive ... a video production." At least one of which occurs in Claims 1, 5, 9, and 13 of the '485 patent and Claims 1, 6, and 11 of the '753 patent.

- "interactively retrieve information about a product or service," "interactively retrieve further information about the one or more products or service." At least one of which occurs in Claims 1, 5, 9, and 13 of the '486 patent and Claims 1, 6, and 11 of the '753 patent.

- "interactive item," which occurs in Claims 1, 5, 7, 9, 10, 14, 16, 18, 19, 23, 25, and 27 of the '555 patent.

The full language of all of the '486, '753, and '555 patent claims are in the record before the Court and the Court has fully reviewed all the claims of the these patents, including those containing the disputed phrases. The Court finds no need to repeat the

full language of those claims in this order.

### B.    Construction of Disputed Claim Phrases

### 1.    "cue point"

The parties dispute the construction of "cue point" which is found in Claims 9, 18, and 27 of the '555 patent. Cinsay asserts that the phrase should be construed to mean "a time in a video production," and Joyus asserts that the construction should be "time set in the video content of a video production triggering a request to a server for an advertisement."

Cinsay argues that "cue point" should be construed to mean "a time in video production" because the parties are in agreement that this is the case and because Joyus' proposed construction improperly imports additional limitations from the specification into the claim language. Joyus argues that the phrase should be construed as "time set in the video content of a video production triggering a request to a server for an advertisement" because the specification of the patent and specifically the sole embodiment describes a cue point as being a time set within the video content of a video production at which an advertisement is requested from a server and then displayed to a user. Joyus argues that these descriptions of cue points in the specification should limit the meaning of "cue points."

The Court initially notes that in its briefing, Joyus addresses the phrase "cue point" as it is used in the claims of all of the patents in suit. But, Cinsay in its briefing

focuses on the use of the phrase in the '555 patent. Cinsay acknowledges in a footnote that the '486 and '753 patents use the phrase "predetermined cue point," that the parties are in agreement as to the meaning of "predetermined", and that the Court's construction of "cue point" of the '555 patent should be the same as that of the construction in the other patents in suit. For these reasons, the Court will only construe "cue point" once, which should be applied to the claim language of all of the patents in suit.

Both of the parties assert that the proposed construction should include that a cue point is a time in the video production. Cinsay's proposed construction simply states this. Joyus' construction includes this same language, but also adds that 1) cue points are specifically set in the video content of the video production and 2) the cue point triggers a request for an advertisement to be sent from a server. Joyus argues that these two additional limitations should be added to the construction because inclusion of these further limitations is supported by the specification. Cinsay argues that importation of these limitations improperly limits the meaning of the phrase.

The Court agrees with Cinsay that inclusion of the video content limitation in the construction improperly limits the meaning of the phrase as it is used in the claims. The Court starts with the claim language itself. Claim 1 of the '486 patent reads: "transmitting … a video production to a video player, the transmitted video production associated with a plurality of pre-defined cue points …" '486 Patent at 5:45-47. This

claim language does not require that a cue point be part of the video content of a video production. All that it requires is that a cue point be "associated" with the "plurality of pre-defined cue points." The language states an association between cue points and the video production. It does not state that cue points have to be part of the video production. It does not even get close to Joyus' proposal that the cue point not only be located in the video production but that it is specifically located in the video content layer of the video production. This supports a determination that Joyus' proposed construction is incorrect.

Joyus argues that the specification supports its requirement that a cue point be "set in video content." Joyus directs the Court's attention to specification language that describes the video production as being composed of several layers, one of these being the video content layer, and to several statements made in the specification that describe a cue point as being "in the video content."

The specification states that, "The interactive video editor 102 also enables layers to be added to the video production. More specifically, an overlay element allows users to see an underlying video preview. The first layer on the bottom forms a base layer, and anything layered on top of that at least partially obscures the layers underneath it." '555 Patent at 3:34-39.

The Court is not persuaded that this language has anything to do with a cue point being in the video content of a video production. This language simply discusses

the fact that there are multiple layers of the video production. The passage is not referring at all to cue points. It is referring to layers of advertisements and such being imposed on top of the video that a user wants to watch.

Joyus also cites the following specification language in support of its argument, "… the invention comprises a web-based rich media software application allowing non-technical end-users the ability to easily create full frame interactive media overlays into the video production which has been encoded with pre-defined cue points …" '486 Patent at 1:49-54. Again, this language is not directed to where a cue point is located. It is directed to the ability of a user to easily use the invention to create a production with advertisements in line with the disclosed invention. Also, the mention of cue points simply refers to the cue points being encoded into the video production, not the video content.

In further support of its argument that a cue point is in a video content layer, Joyus cites the following additional specification language, "FIGS. 5 and 6 provide additional visual examples of interactive overlay and timeline ads, in which the video player 108 seeks cue points set in the video content …" ('486 Patent at 4:62-64); and "More specifically, FIG. 5 exemplifies how timeline information and advertisement offers directly correspond to cue points inside specific video content assets." ('486 Patent at 4:66-5:2.). Joyus is correct in asserting that these portions of the specification support an interpretation that cue points are in the video content. The first statement

says as much. The second statement says that the cue points are in video content assets. The addition of "assets" to the end of this does not leave an entirely clear picture as to the difference between storing cue points in "video content" and storing them in "video content assets."

But, even if both statements indicate that a cue point is stored within the video content, this is not enough to support inclusion of the limitation in the claim language. This language indicating that cue points are stored in the video content occurs in the description of one preferred embodiment. This alone, is not sufficient to impose this limitation upon the claim language. It certainly is not enough to define cue points as being part of the video content. It is conceivable that cue points could be stored in any number of locations and manners, and not only specifically in the video content of the video production. This possibility is indicated by the patentee's choice of claim language, which only requires the cue points to be "associated" with the video production. If the patentee wanted the cue points to be stored in the video content of the video production, the patentee could have simply stated this as so in the claim language. The patentee did not. The patentee included the much broader language of "associated with the video production." The inclusion of two sentences in one possible embodiment of the invention that indicate cue points are stored within the video content is simply not enough to overcome the claim language and to import this limitation into the construction of "cue point." For this reason, the Court declines to do

so.

Regard the second dispute over the meaning of cue point, that a cue point triggers a request for an advertisement to be sent from a server, Joyus argues that the specification and the sole embodiment indicate that this is the correct construction. The Court disagrees with Joyus that this limitation should be included in the construction.

The Court starts with the claim language itself. Claim 1 of the '486 patent recites in part, "transmitting an advertisement, from the one or more servers, for display in the video player, the advertisement corresponding to at least one of the plurality of predefined cue points … wherein the video player is configured upon a triggering of the at least one of the plurality of predefined cue points to display at least of one of a visual calling cue point for advertisement …." '486 patent at 5:53-64. This language shows some important points. First, the advertisement is transmitted from a server, but there is no temporal limitation in the claims about when this advertisement is transferred from the server. Second, the triggering of a cue point results in the display of a visual calling cue point for advertisement. (As discussed more fully below, "visual calling cue point" is another disputed claim phrase and is something different from a "cue point.") Joyus proposes that the advertisement is requested at the time of the cue point. But, as just mentioned, there is no requirement in the claims regarding when an advertisement is transferred from the server. Joyus' proposed construction also requires that the cue

point trigger the request for the advertisement. This appears to be inconsistent with the claim language because the claim language already states what that cue point triggers is the display of a visual calling cue point advertisement; not a request for a server to transmit an advertisement.

Other claims of the patents in suit contain similar language as that in Claim 1 of the '486 patent, which lead to the same conclusions. For example, Claim 5 of the '486 patent recites similar language about an advertisement; Claim 1 and 6 of the '753 patent recite similar language about an interactive advertising feature; and Claims 9, 18, and 27 of the '555 patent recite similar language about interactive items. Even though the patents vary because the '486 patent requires advertisements, the '753 patent requires interactive advertising features, and the '555 patent requires interactive items, the use and purpose of "cue point" remains consistent throughout the claim language of all of the patents in suit. The cue point is a time that indicates when an event occurs, whether the event be an advertisement, interactive advertising feature, or interactive item.

The Court further notes that Joyus's construction also imposes that in all cases what is sent from the server is an "advertisement." Requiring that a cue point request an advertisement would negate any distinction, if there is one, between the advertisement of the '486 patent, the interactive advertising features of the '753 patent, and the interactive item of the '555 patent. Whether or not an "interactive item" must be an

advertisement is an issue to be taken up in the construction of that term below; not in the construction of cue point.

The specifications provide further information as to what happens when a cue point is reached. There is an apparent inconsistency between what the claims say happens at a cue point (an advertisement or interactive item is displayed) and what Joyus' proposed construction says happens at a cue point (a request for an ad is sent to a server.) Joyus directs the Court's attention to the following specification language that states that "... cue points trigger pre-defined advertising events stored ... in the ad server or other database ..." ('486 Patent at 5:2-4); "... cue points ... request interactive overlay elements from an ad-server ..." ('486 Patent at 1:53-54); and "... cue points are utilized to trigger pre-defined advertising events ..." ('486 Patent at 1:55-56.) Joyus also points to the flow chart of Figure 2 of the patents, which indicates that at a time represented by a cue point a request for an advertisement is sent out, the advertisement is located, and then sent to the viewer. Joyus asserts that these specification descriptions amount to a disclosure that limits the claimed invention to being one in which the cue points are times when a request for an advertisement is sent to a server, which is then transmitted back to the video player for playback. Essentially, Joyus asserts that the patentee has limited the scope of the claims to the sole embodiment disclosed. In support of this proposition, Joyus cites *Honeywell Int'l, Inc. et al. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006); *Microsoft v. Multi-Tech Sys., Inc.*, 357 F.3d

1340 (Fed. Cir. 2004); *Netword, LLC v. Central Corp*, 242 F.3d 1347 (Fed. Cir. 2001); and *Wang Labs, Inc. v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999). In each of these cases, the claims were limited to the description provided by the sole embodiment. In contrast, Cinsay cites *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003); *Comark Commc'ns, Inc. v. Harris Corp*, 156 F.3d 1182 (Fed. Cir. 1998); and *Brookhill-Wilk 1, LLC v. Intuituve Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003), for the proposition that particular embodiments and examples in the specification will not generally be read into the claims.

Cinsay is correct in that specification limitations should not generally be imported into claims and the claims must be read in light of the specification. But as discussed in *Microsoft,* reading the claims in light of the specifications can result in limiting claim language based on the specification when the patentee repeatedly and consistently describes an invention in the specification as having a certain feature. This is especially true when the patentee repeatedly describes the "invention" as having a certain feature, as opposed to describing one possible embodiment that has that feature. This can occur in the summary section of the patent, which speaks to the invention as a whole or it can occur in the embodiments and detailed description. The language used may lead to the "inescapable conclusion" that the feature is a feature of the invention as a whole and should be incorporated into the claim meaning. *Microsoft* at 1347-49. Furthermore, the prosecution history may speak on the matter. But, each

case is unique and must be viewed on the factual context in which they arose. *Wang* at 1383. "Whether an invention is fairly claimed more broadly than the "preferred embodiment" in the specification is a question specific to the context of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art …" *Id*.

With these principles in mind, the Court turns to the specification language cited by Joyus to supports its assertions. The specification language that is cited can be divided into two groups; first language occurring in the patent summary and second language occurring in the patent detailed description. Joyus directs the Court's attention to the following language that occurs in the patent summaries:

> "More specifically, **the invention comprises** a web-based rich media software application allowing non-technical end-users the ability to easily create full frame interactive media overlays into the video production which has been encoded with **pre-defined cue points that request immersive full motion video interactive overlay elements from an ad-server.**
>
> **The cue points are utilized to trigger pre-defined advertising events stored and indexed with metadata in an ad server or other database.** By way of example, an advertising event may include the extraction of a single frame or a series of frames of the encoded video production, which in turn becomes the **interactive advertisement that is triggered by the pre-set cue point and presented to the user** as a seamless advertising/entertainment experience. …"   '486 Patent at 1:49-62 (emphasis added).

This summary language does two things. First, it confirms that advertisements

are stored on a server or other database, which is in agreement with the claim language. Second, it indicates that triggering of a cue point requests an advertisement from a server and displays that advertisement to the user. Since this language is included in the summary of the invention and is a general statement about the invention as a whole, this supports inclusion of the concept of a cue point triggering a request for an ad from a server. But, the language also presents the same apparent ambiguity regarding a cue point both causing a request for an advertisement from a server and displaying that ad at the same time.

The detailed description language of the specifications of the patents, cited by Joyus, further explains how this operates in at least one embodiment of the invention. Joyus directs the Court's attention to the following language that occurs in the detailed description of the patents:

> "Fig 2. is a flow chart exemplifying steps in the operation of the invention. In step 202 operation begins, and in step 204 a request is generated by the video player 108 (per input from a user) for a video production, and transmitted to the video server 104. In step 206, the video server 104 receives the request for a video production and, in step 208, the video server 104 locates the video production and transmits it to the video player 108. In step 212, the video player 108 begins playing the video production until a cue point is triggered in step 214. **Upon triggering the cue point**, execution proceeds to step 216 wherein **the video player generates and transmits to the ad server** 106 **a request** via HTTP POST requests **for an ad** and includes with the request a cue point name and video ID into which the ad will be placed." '486 Patent at 3:66-4:12 (emphasis added.)"

This detailed embodiment description and the associated Figure 2 of the patents again explain that reaching a cue point means that the invention will send a request to an ad server for an ad to be sent to the viewer for display. Examination of Figure 2 also shows that the ads, which are stored in an ad server, are requested by the player at the time a cue point is reached. While these descriptions are contained within an embodiment of the patents, it is also in agreement with the language of the summary.

These references explaining the function of a cue point (the summary, embodiment, and figure references) are the only explanation in the relatively short patents that describe what a cue point does. And, the explanation, which is provided by the patent, for what a cue point does is that a cue point triggers a request for an ad to be sent from an ad server for display in the viewer. All of which supports inclusion of the limitation in the claim construction. But, the Court notes that this case differs from those of *Microsoft* and *Wang* in that in those cases, there was also evidence in the file wrapper that supported imposing specification limitations on the claim language. In this case, the parties have not submitted any prosecution history supporting such a conclusion. Even without a supporting prosecution history, Joyus' argument that the specification limitations should be imparted into the claims might be a persuasive argument for the '486 patent and '753 patent. But this is not the case for the '555 patent.

Not all of the claims of the '555 patent require "cue points." For example,

Independent Claim 1 of the '555 patent discloses "a video player for advertising a product or service in a video production." '555 Patent at 5:66-67. The claim goes on to require display of "interactive items," but there is no requirement that the interactive items be displayed upon reaching a cue point. Cue points do not become a required limitation until one reaches, dependant Claim 9 (which is dependent on Claim 8, which is dependent on Claim 1). Dependant Claim 9 reads, "The video player of claim 8, wherein the one or more interactive items are selectively displayed upon the triggering of a cue point." Other claims in the '555 patent are similar, for example Claim 10/Claim 17 and Claim 19/Claim 27.

If the Court was to adopt Joyus' proposed construction, this would be inconsistent with the claims of the '555 patent. Joyus' proposed construction would require that the advertisement, which in this case is the interactive item, not be sent to the viewer until a cue point was reached and a request was sent to a server. But, the independent claims do not require the use of cue points at all. They do require the display of the interactive item. It is impossible for the interactive item to be displayed on the video player if it was never sent to the video player.

Since the parties propose that "cue point" should be construed the same across all of the patents in suit, Joyus' proposed construction cannot be the correct construction because it is directly contradictory with the claims of the '555 patent. For this reason, the Court declines to include Joyus' "request to a server" limitation in the

construction of "cue point."

So, since the parties are in agreement that a cue point is a time in video production; there is no support in the intrinsic record to require a cue point to be stored in the video content layer of a video production; and requiring a cue point to trigger a request for an advertisement to be sent from a server before the advertisement is displayed to a user is inconsistent with the claim language of the '555 patent the Court construes "cue point" as "a time in video production."

## 2. "calling cue point"

The parties dispute the construction of "calling cue point," which is found in Claims 5, 8, 9, 12, 13, and 16 of the '486 patent. Cinsay asserts that the phrase should be construed to mean "a marker corresponding to the time in a video production at which data external to the video production is called," and Joyus asserts that the construction should be "a marker corresponding to the time in a video production at which data external to the video production is retrieved from a server." The Court notes that a "calling cue point" is not a type of "cue point." As used in the patent in suit, a "cue point" is a time; a "calling cue point" is a marker that indicates the timing of cue point and is that is displayed to the viewer. The first part of the parties' proposed construction is the same, i.e. a "marker corresponding to the time in a video production at which data external to the video production …" But the ending of the parties' proposed constructions differ in one aspect. Cinsay asserts that a calling cue point is

simply "called," and that it is not necessary to specify from where it is called. Joyus asserts that a calling cue point indicates a time that data must be retrieved from a server.

Regarding a calling cue point being a marker, the patent claims provide that a "calling cue point" is one of the items that could be displayed upon reaching a cue point. For example, Claim 1 reads in part, "wherein the video player is configured upon a triggering of the at least one of the plurality of pre-defined cue points to display at least one of a visual calling cue points for the advertisement, information concerning the advertisement, or the advertisement in a timeline of the video player to the viewer of the player." '486 Patent at 5:62-67. As further indicated in Figure 4 of the patent and in the related discussion in the specification, a calling cue point is a marker on the timeline displayed to the user and this marker is associated with the time of a cue point related to an advertisement. For these reasons, it is clear that the parties are correct in stating that a calling cue point is a marker. It is also clear that this marker indicates the position of an advertising event within the timeline and that the advertising event must be associated with a cue point. So, the Court agrees with the parties that the calling cue point is a marker indicating the time of a cue point.

But, the parties go on to describe what happens at that time, i.e. at the time of the cue point. Cinsay asserts that a calling cue point simply marks the time that data is "called," and that it is not necessary to specify from where it is called. Joyus asserts that

a calling cue point must mark the time data is retrieved from a server. Essentially, this is the same dispute that was presented in the construction of "cue point," i.e. whether an advertisement must be requested and retrieved from an ad server or if it is not necessary or proper to include this limitation in the claim construction.

In light of the construction of "cue point" provided above, the Court finds it unnecessary and unhelpful to further describe what happens at the time marked by a calling cue point. Calling cue points mark the locations of cue points, but what happens at a cue point is already addressed in the construction of cue point. So, it is not necessary or helpful to further include what happens at a cue point in the construction of "calling cue point." This is more properly addressed in the construction of "cue point," which the Court has already addressed. The Court has construed cue point to mean "a time in video production." A calling cue point, as just discussed, is a marker that indicates the time of a cue point. There is no reason or need to further indicate what happens at a cue point in the construction of "calling cue point." For these reasons the Court declines to adopt either parties proposed constructions in full and the Court construes "calling cue point" to mean "a marker indicating the time of a cue point."

**3.  "transmitting an [advertisement/interactive advertising feature," "transmit an [advertisement/interactive advertising feature]," and "receive ... an interactive advertising feature"**

The parties dispute the meaning of the phrases "receive ... an interactive

advertising feature," "transmitting an [advertisement/interactive advertising feature]," and "transmit an [advertisement/interactive advertising feature]," at least one of which occurs in Claims 1, 5, 9, and 13 of the '486 patent and Claims 1, 6, and 11 of the '753 patent. The parties brief these three phrases collectively because of the similarities between the phrases. For this reason, the Court will also address these phrases collectively. Cinsay asserts that "transmitting," "transmit," and "receive" should be given their plain and ordinary meaning. Joyus asserts that the constructions of the these phrases should be "transmitting an interactive advertisement from an ad server to a video player in response to a request generated by the triggering of the corresponding cue point in a video production playing on the video player."

The Court notes that like in the construction of "calling cue point," the dispute over this construction is the same dispute presented in the construction of "cue point." Joyus does not dispute the meaning of "transmit", "transmitting", or "receive". Instead Joyus adds additional limitations to the construction that impose that advertisements and interactive advertising features are only sent to the video player after a cue point is reached and a request for an ad is sent from the video player to a server. Like in the construction of "calling cue point," the inclusion of this limitation relates to the construction of "cue point," not to the construction of transmits, transmitting, or receive.

Cinsay assert that the terms should be given their plain and ordinary meaning.

Considering that Joyus' proposed constructions simply repeat these words, while adding these additional limitations, it cannot be said that Joyus opposes the use of the plain and ordinary meaning of "transmit," "transmitting," or "receive." For these reasons, the Court construes these phrases to have their plain and ordinary meaning.

### 4. "transmitting … a video production," "transmit a video production," and "receive a video production"

The parties dispute the interpretation of the phrases "transmitting … a video production," "transmit a video production," and "receive a video production." At least one of these phrases occurs in Claims 1, 5, 9, and 13 of the '485 patent and Claims 1, 6, and 11 of the '753 patent. The parties brief these phrases collectively because the similarities between the phrases. For this reason, the Court will construe these phrases collectively. Cinsay asserts that the phrases should be given their plain and ordinary meaning, and Joyus asserts that the phrases should be construed as "[transmit[ing]/receive] a video from a video server to a video player in response to a request generated by the video player."

Joyus argues that the phrases should be interpreted to mean that a video is not transmitted or received to or by the video player until the video makes a request for a video. Joyus argues that imposing this limitation on the phrase would be proper because this is the way that the operation of the invention in the sole embodiment disclosed in the patents is described. In support of this argument, Joyus only points to Figure 2 of

the patents and the associated discussion related to Figure 2. Joyus is correct in its assertion that this figure and the related discussion indicate that a video is not transmitted to or received by the video player until after the video has been requested. But, this is the only patent language indicated by Joyus in support of its argument. This alone is insufficient to impose the limitations of a sole embodiment on the claim language.

The claim language is silent as to when a video is transmitted to or received by a video player. If the inventor wanted this to be specifically linked to a request by the video player, this could have been easily included in the claim language. Due to this and the fact that the specification does not support any further limitation of this language, the Court refuses to adopt Joyus' proposed constructions of these terms.

In addition, Joyus argues that the Court must construe these phrases because there is a bona fide dispute over the meaning of these phrases and as such adoption of Cinsay's proposal to apply the plain and ordinary meaning of these terms would be improper. The Court notes that Joyus simple repeats the terms "transmitting" in its proposed constructions of these phrases. The remainder of Joyus' proposed constructions assert the "request from a video player" limitation. This indicates that Joyus does not actually dispute use of the plain and ordinary meaning of the these terms. In light of the fact that the Court finds it improper to include the "request from a video player" limitation proposed by Joyus and Joyus provides no dispute as to the

actual meaning of the words "transmit[ting]" and "receive," the Court holds that the phrases shall be given their plain and ordinary meaning.

**5. "interactively retrieve information about a product or service" and "interactively retrieve further information about the one or more products or service"**

The parties dispute the meanings of "interactively retrieve information about a product or service" and "interactively retrieve further information about the one or more products or service." At least one of these phrases occurs in Claims 1, 5, 9, and 13 of the '486 patent and Claims 1, 6, and 11 of the '753 patent. The parties brief these phrases collectively because of the similarities between the phrases. For this reason, the Court will construe these phrases collectively. Cinsay asserts that the phrases should be given their plain and ordinary meaning. Joyus asserts that the phrases should be construed as "retrieve information from a server in response to selection by the user."

Joyus argues that it is necessary to construe the phrase so that it is clear that the further information is received 1) from a server and 2) in response to a selection by the user. In support of its argument that the information is sent from a server, Joyus argues that the receipt of the further information functions in the same manner as receipt of the initial advertisement, i.e. both come from a server, and that the specification confirms this.

The claims themselves do not require that the further information come from a

server at the time of the interaction by the user. The claims are silent as to the source of the further information. This is in distinct contrast to the advertisement. In that case, the claims specifically require that the advertisement be sent from a server. For example, Claim 1 of the '753 patent reads as follows: "... transmitting an interactive advertising feature separate from the video production, from the one or more servers, ..." '753 Patent 6:1-2. There is no similar requirement in the claim language regarding the source of the further information.

Joyus argues that the specification described by the patents describe that the further information is retrieved from a server and that such a limitation should be imposed upon the claim language. The specific language that Joyus cites occurs in the summary of the invention and reads as follows, "Users can interact with the icons to garner more information ...., employing the same aforementioned calls ..." ('486 Patent at 2:9-13) and "Once the cue point triggers an event, the system calls the specific advertisement into the video player ...." ('486 Patent at 1:63-64.) Joyus argues that this language shows that advertisements are sent from a server through system calls and that further information is likewise sent from a server through the same types of system calls and that because of this the limitation, that further information is obtained from server at the at the time the users request the further information, should be imposed on the claim language.

The Court finds Joyus' argument unconvincing. The Court first notes that the

specification language cited by Joyus does not reference where either the advertisement or the further information is called from or how either is called. So, this language does not support Joyus' proposed constructions. Additionally, even if the language made more specific reference to where the further information came from, the language is insufficient to require that this information be sent from a server at the time a user request further information. For these reasons, the Court declines to adopt Joyus' proposal that the phrases be construed to require that the further information is retrieved from a server at the time a user request the further information.

Regarding Joyus' argument that further information is requested in response to a request by a user, Joyus argues that this limitation should be included in the construction because the claims and specification require this interaction from a user. Joyus is correct in stating that user interaction is required. The claims already recite as much. The claims recite, in part, that, "... wherein, the interactive advertising feature is configured *to allow a user* to retrieve further information ..." ('753 Patent at 6:14-15) (emphasis added) and "... including a selection enabled portion that *allows a viewer* of the video player to interactively retrieve further information ..." ('486 Patent at 5:56-58) (emphasis added). The claims are clear that the further information is retrieved upon interaction by a user or viewer. Since the claims already specify that the further information is retrieved upon the interaction of a user, there is no need to repeat this requirement in the construction of these disputed phrases. The claims are clear and

already speak on the issue. So, the Court declines to adopt this portion of Joyus' proposed constructions.

Cinsay, on the other hand, proposes that the phrase be given their plain and ordinary meaning because the words of the phrases are used with their customary and normal meaning. Having disposed of Joyus' proposed constructions, there are no other disputes over the meanings of these phrases. The Court is in agreement with Cinsay that there is no need to construe the phrases beyond their plain and ordinary meaning.

So, because the claims and specification do not require that the further information be sent from a server at the time of a user request, the claims already require that the further information be obtained upon interaction by a user, and the words of the phrase are used with their customary and normal meaning, the Court holds that the phrases shall be given their plain and ordinary meaning.

### 6. "interactive item"

The parties dispute the meaning of the phrase "interactive item" as used Claims 1, 5, 7, 9, 10, 14, 16, 18, 19, 23, 25, and 27 of the '555 patent. Cinsay asserts that the phrase should be construed as "an item that can respond to user input," and Joyus asserts that the construction should be "portion of an advertisement that responds to input from a viewer of a video player." Based on their proposed constructions and briefing, the parties are in agreement that interactive items respond to user input, but they disagree as to whether interactive items are a part of advertisements. Joyus

proposes that interactive items are part of advertisements based on the repeated and consistent description of advertisements in the patent's specification, while Cinsay asserts that inclusion of this limitation into the construction of the phrase would improperly limit the claim language.

The claim language already provides an indication of whether or not the interactive item is part of an advertisement. The disputed phrase only occurs in the '555 patent. It is used in independent Claims 1, 10, and 19 as well in a number of dependent claims. The independent claims all require that an interactive item be "configured to relate to one or more products or services." '555 Patent at 6:10-11; 6: 61-62; and 8:3-4. This language provides a limitation on an interactive item that it be related to a product or service. In addition, the claims require that this interactive item is displayed to a user while the user is watching the video production. '555 Patent at 6:6-11; 6:55-60; 7:41-8:2. And, that a user can obtain further information about the product or service by interacting with the interactive item. '555 Patent at 6:13-21; 6:64-7:5; and 8:6-14. These requirements spell out the description of an advertisement. An advertisement, in the customary and normal usage of the term, is something that is displayed to a person that relates to products or services provided by a somebody else. In addition, in this case, the advertising goes even further than simple displaying one item related to a product or service, the interactive item allows the user to obtain extra information about the product or services. In addition to these requirements, which all indicate that

interactive items are part of advertisements, dependant Claims 6, 15, and 24 take that advertisement one step further. Instead of just displaying information and further information about a product or service, to entice a user to purchase the product or service, these dependant claims allow for the user to actually enter into a "transaction that involves a user submitting information that is sent to a remote server." In other words, not only is a product or service advertised to the user through the interactive item, the interactive item can be used to retrieve further information that also lets the user purchase the goods or services. All of this claim language strongly indicates that interactive items are part of an advertisement as argued by Joyus.

Joyus is also correct in stating that the patent specification repeatedly and consistently refers to advertisements being displayed to users, that those advertisements contain interactive links, and that the specification fails to use the phrase "interactive item." For example, the detailed description recites, "The ad is then displayed as either or both an ad with the link as an overlay on the video production ... or ... as a calling cue point for the ad and link in an icon or logo ..." ('555 Patent at 5:4-6); "An example of the event may include extraction of a single video-frame or series of frames of a video production, which in turn becomes the interactive advertisement that is laid over the video production to create a seamless interactive clickable video ad ..." ('555 Patent at 5:27-31); "By use of the present invention, an improved method is provided for advertising products by interactively placing them either in a timeline or

embedding them in a live overlay on a video production..." ('555 Patent at 5:34-37.)

This description of advertisements also occurs in the summary of the invention, which reads, in part, as follows, "... cue points request immersive full motion video interactive overlay elements from an ad-server ..." '555 Patent at 1:61-63; "... an advertising event may include the extraction of a single video frame or series of frames of the encoded video production, which in turn becomes the interactive advertisement ...." ('555 Patent at 1:66-2:2); and "... the system ... seamlessly overlays the initial video production with the enhanced interactive product ads ..." ('555 Patent at 2:5-8.) All of this language consistently describes advertisements as being interactive and allowing a user to obtain more information about a product or service. In the '555 patent, this refers to the "interactive item" of the claim language.

So, because the claim language itself contemplates and requires that an interactive item has the properties as an advertisement and the specification repeatedly and consistently describes the invention as having interactive advertising, which corresponds to the "interactive item" of the claims the Court is of the opinion that interactive items are part of an advertisement and the phrase should be construed accordingly. For these reasons, the Court construes "interactive item" to mean "portion of an advertisement that responds to input from a viewer of a video player."

## IV. Agreed Terms/Phrases

The Court notes that the parties have submitted to the Court multiple terms in

which the parties assert construction is necessary, but that the parties agree to the construction of those terms and phrases. The Court hereby approves and adopts the agreed constructions of the parties.

**SO ORDERED.**

Signed March 4th, 2015.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE

**SUMMARY CHART OF CLAIM CONSTRUCTIONS OF DISPUTED TERMS**

**Disputed Terms of the '555 Patent**

| Language of Disputed Priority Term of Claims | Cinsay's proposed Construction | Joyus' Proposed Construction | Judge's Construction |
|---|---|---|---|
| "cue point" | "a time in a video production" | "time set in the video content of a video production triggering a request to a server for an advertisement" | "a time in video production" |
| "interactive item" | "an item that can respond to user input" | "portion of an advertisement that responds to input from a viewer of a video player" | "portion of an advertisement that responds to input from a viewer of a video player." |

**SUMMARY CHART OF CLAIM CONSTRUCTIONS OF DISPUTED TERMS**

## Disputed Terms of the '486 Patent

| Language of Disputed Priority Term of Claims | Cinsay's proposed Construction | Joyus' Proposed Construction | Judge's Construction |
|---|---|---|---|
| "calling cue point" | "a marker corresponding to the time in a video production at which data external to the video production is called" | "a marker corresponding to the time in a video production at which data external to the video production is retrieved from a server" | "a marker indicating the time of a cue point" |
| "transmitting an advertisement"<br><br>"transmit an advertisement" | Plain and ordinary meaning | Transmit:<br><br>"transmit[ting] an interactive advertisement from an ad server to a video player in response to a request generated by the triggering of the corresponding cue point in a video production playing on the video player" | Plain and ordinary meaning |
| "transmitting … a video production"<br><br>"transmit … a video production" | Plain and ordinary meaning | "transmitting a video from a video server to a video player in response to a request generated by the video player" | Plain and ordinary meaning |
| "interactively retrieve | Plain and ordinary | "retrieve | Plain and ordinary |

| further information about a product or service" | meaning | information from a server in response to selection by the user" | meaning |
| --- | --- | --- | --- |

**SUMMARY CHART OF CLAIM CONSTRUCTIONS OF DISPUTED TERMS**

## Disputed Terms of the '753 Patent

| Language of Disputed Priority Term of Claims | Cinsay's proposed Construction | Joyus' Proposed Construction | Judge's Construction |
|---|---|---|---|
| "transmitting an interactive advertising feature"<br><br>"transmit an interactive advertising feature"<br><br>"receive … an interactive advertising feature" | Plain and ordinary meaning | Transmit:<br><br>"[transmit[ting]/receiving] an interactive advertisement from an ad server to a video player in response to a request generated by the triggering of the corresponding cue point in a video production playing on the video player" | Plain and ordinary meaning |
| "transmitting … a video production"<br><br>"transmit a video production"<br><br>"receive a video production" | Plain and ordinary meaning | "transmitting a video from a video server to a video player in response to a request generated by the video player" | Plain and ordinary meaning |
| "interactively retrieve further information about a product or service"<br><br>"interactively retrieve further information about the one or more products or services" | Plain and ordinary meaning | "retrieve information from a server in response to selection by the user" | Plain and ordinary meaning |